**IN THE COURT OF APPEALS OF IOWA**

No. 22-1173
Filed September 21, 2022

**IN THE INTEREST OF L.F.,**
**Minor Child,**

**K.A., Father,**
        Appellant,

**A.D., Mother,**
        Appellant.
_____

Appeal from the Iowa District Court for Hancock County, Karen Kaufman Salic, District Associate Judge.

The mother and possible biological father separately appeal the termination of their respective parental rights to their child. **AFFIRMED ON MOTHER'S APPEAL; REVERSED AND REMANDED ON POTENTIAL FATHER'S APPEAL.**

Barbara J. Westphal, Belmond, for appellant father.

Cameron M. Sprecher of Jorgensen Law Office, PC, Mason City, for appellant mother.

Thomas J. Miller, Attorney General, and Ellen Ramsey-Kacena and Chandlor Collins, Assistant Attorneys General, for appellee State.

Carrie Rodriguez, Garner, attorney and guardian ad litem for minor child.

Considered by Vaitheswaran, P.J., and Greer and Schumacher, JJ.

**GREER, Judge.**

The mother and the potential biological father, K.A., appeal the termination of their parental rights to L.F., who was born in late 2021.[1]

We review termination decisions de novo. *In re A.H.*, 950 N.W.2d 27, 33 (Iowa 2020). Termination of parental rights under chapter 232 follows a three-step process. *Id.* But our review on appeal is confined to those issues that—after being properly preserved—are actually raised and briefed on appeal by the parent challenging termination. *See Hyler v. Garner*, 548 N.W.2d 864, 870 (Iowa 1996) ("We exercise our de novo review only with respect to issues raised and preserved at trial. Similarly, our review is confined to those propositions relied upon by the appellant for reversal on appeal." (internal citation omitted)). Because "each parent's parental rights are separate adjudications, both factually and legally," we consider each appeal separately. *In re J.H.*, 952 N.W.2d 157, 171 (Iowa 2020).

**I. Mother's Appeal.**

The court terminated the mother's parental rights under Iowa Code section 232.116(1)(e), (h), (g), and (*l*) (2022). The mother does not contest the State proved these grounds for termination. She focuses her petition on appeal on whether she should have been given additional time to work toward reunification with L.F. and if the loss of her rights is in the child's best interests.

The court may delay permanency and give the parent more time to work toward reunification when it can point to "specific factors, conditions, or expected behavioral changes which comprise the basis for the determination that the need

---

[1] The juvenile court also terminated the parental rights of L.F.'s legal father—the mother's husband at the time of conception. He does not appeal.

for removal of the child" from the parent's care will "no longer exist at the end of the" extension. Iowa Code § 232.104(2)(b). Like the juvenile court, we cannot do so.

The mother has a long history of using methamphetamine. She gave birth to a child in 2016 who was born with methamphetamine in her body; the juvenile court terminated the mother's parental rights to this child in 2018. Then the mother lost her parental rights to two other children in August 2020 after having given birth to another child in June 2019 with methamphetamine in her system. History continues to repeat itself; L.F., the child at issue here, was born in late 2021 with methamphetamine in her system. The mother admitted to ongoing use during her pregnancy with L.F., including within twenty-four hours of the child's birth, and then continued to use the drug until less than a month before the June 2022 termination trial. The mother testified she could not remember the exact length of time but claimed she was twenty-five or twenty-six days sober. She recognized she was "late with [her] progress" but suggested this time would be different, noting she had more family supports than in previous cases.

We hope the mother achieves her goals. But we look to the mother's past and note that six years of off-and-on services from the Iowa Department of Human Services (DHS) and the termination of her rights to three other children has not led to her long-term sobriety. *See In re Z.S.*, No. 15-1535, 2016 WL 757419, at *2 (Iowa Ct. App. Feb. 24, 2016) ("In determining the future actions of the parent, her past conduct is instructive."). We cannot say the mother is likely to make long-lasting changes in the next six months that will enable her to parent L.F. *See In re A.B.*, 815 N.W.2d 764, 776 (Iowa 2012) ("We have long recognized that an

unresolved, severe, and chronic drug addiction can render a parent unfit to raise children."); *In re J.P.*, No. 19-1633, 2020 WL 110425, at *2 (Iowa Ct. App. Jan. 9, 2020) (questioning whether a parent's relationship with methamphetamine was over where the parent had a long history of using the drug and had been sober only two months before the termination trial). So additional time for reunification is not warranted.

The mother also argues termination of her rights is not in L.F.'s best interests. *See* Iowa Code § 232.116(2). But the mother is not now and may never be in the position to provide L.F. a safe, stable home. *See In re J.E.*, 723 N.W.2d 793, 802 (Iowa 2006) (Cady, J., concurring specially) (providing that the defining elements of a child's best interests are the "child's safety and his or her need for a permanent home"). Termination of the mother's rights will allow L.F. to achieve permanency, which is in her best interests. *See In re A.M.*, 843 N.W.2d 100, 113 (Iowa 2014). We affirm the termination of the mother's parental rights.

## II. Potential Biological Father's Appeal.

L.F. was born in November 2021 with methamphetamine in her system and was removed from the mother's care before ever being discharged from the hospital. The mother was married at the time of L.F.'s conception,[2] and the juvenile court concluded the mother's spouse was L.F.'s "legally established father." But there was a question over who was the biological father of L.F., and the mother gave a number of possibilities, including the former husband and two other men.

---

[2] The mother and her husband divorced as of May 7, 2021.

All three were excluded as the possible father through paternity testing by the time of the termination trial in June 2022.

The mother also named K.A.—the potential father who is party to this appeal—as a possible biological father. She provided his name by January 14, 2022 at the latest.[3] It seems nothing was done with this information until March 23, when the county attorney filed notice that the mother had named "K.A. as a potential biological father" and that the county attorney "intend[ed] to serve [K.A.] with a petition and summons for appearance at the review hearing set for May 6, 2022." A summons and notice of hearing issued for K.A. that same day. K.A. applied for appointed counsel, which the juvenile court approved on April 12.

Leading up to the May 6 hearing, DHS filed an update with the court, in which it noted that K.A. was still a potential biological father for the child and stating, "Once paternity is established then services and interactions will also be established with the identified father." In its order following the hearing, the juvenile court ordered K.A. to "make arrangements from [DHS] for testing of [L.F.'s] paternity, keep all appointments and cooperate with all testing procedures. *Funding for the testing shall be paid by [DHS] approved funds.*" (Emphasis added.)

A few days later, the county attorney petitioned to terminate the parental rights of the mother, the mother's former husband (L.F.'s legal father), and K.A.

The termination trial took place on June 29, 2022—at which point DHS had yet to authorize paternity testing for K.A. in spite of K.A.'s expressed willingness to

---

[3] We have not found mention of K.A. before this date in the record. But in its adjudicatory order filed January 14, the juvenile court states K.A. was named by the mother as a potential father "[e]arly in the child abuse investigation."

comply with paternity testing. According to the testimony of the caseworker, she filled out the necessary paperwork "as soon as [DHS] received [the May 6 court] order." The caseworker's supervisor did not immediately approve the request, so the caseworker followed up with the supervisor multiple times that month. At some point before the termination trial, the supervisor told the caseworker "she had not sent [the approval] on" and that "she was not going send that on because it would be the end of our fiscal year and the funding—or the testing would not have gotten done before the end of the fiscal year so she was going to wait." The supervisor reported she would authorize the testing when she returned from vacation on July 5—about a week after the termination trial was taking place.[4]

This failure to approve paternity testing—in spite of a court order to do so—not only left the question of K.A.'s paternity up in the air, it also prevented K.A. from receiving services from DHS.[5] The caseworker testified that she has spoken with K.A. and he "sounded somewhat excited" at the prospect of raising the child. He also "indicated that he was interested in participating in . . . services." But DHS would not offer drug testing or other family centered services (FCS), except visits, without confirmation K.A. was the biological father.[6]

---

[4] The juvenile court referenced the funding decision as "a frustrating level of bureaucracy that does not advance anything good for children." It is difficult to argue with this characterization.

[5] K.A. was offered visits with the child but he told the caseworker "[h]e wanted to know if he was the father before he started any interactions with [L.F.]."

[6] The juvenile court found K.A. "has refused the offer of FCS services, has not engaged in substance abuse or mental health treatment despite admittedly struggling in those areas." But the report DHS submitted to the court in May stated it would "establish services and interactions" only after paternity was confirmed. The DHS caseworker testified K.A. had been offered visits with L.F., but when specifically asked if DHS had ordered drug testing, she testified she had not "because he is not at this point the confirmed father." Any mental-health or

Still, the juvenile court terminated K.A.'s possible parental rights to the child under Iowa Code section 232.116(1)(e) and (h).[7]

K.A. argues DHS failed its mandate to make reasonable efforts to work toward "reunification" of him and the child.[8] *See* Iowa Code § 232.102(4)(b) ("[R]easonable efforts shall be made to make it possible for the child to safely return to the family's home."); *see also In re C.B.*, 611 N.W.2d 489, 493

---

substance-abuse programs K.A. was recommended to participate in appear to have been at his own cost and initiative, as the caseworker explained K.A. told her he was waiting for his insurance from his new job to kick in before he could start them. Plus, it is unclear whether it was ever actually recommended to K.A. that he participate in such programs prior to his paternity being confirmed; DHS's June 17 report to the court stated, "Should [K.A.] be identified as the father, *then* he should also complete a substance abuse evaluation and follow all recommendations." (Emphasis added.) Other than visits, the record before us is devoid of services DHS offered K.A. before the termination trial.

[7] In the termination order, the juvenile court ordered termination of K.A.'s rights under section 232.116(1)(e) and (h) as well as under (g). This appears to be a scrivener's error, as the State did not petition to terminate K.A.'s rights under paragraph (g) and K.A. is not mentioned in the court's analysis of paragraph (g).

[8] We recognize the father did not make a specific motion for reasonable efforts regarding DHS's lack of follow through to paternity test him, which our error-preservation rules generally require for us to address the claim. *See In re S.R.*, 600 N.W.2d 63, 65 (Iowa Ct. App. 1999) ("While the State has the obligation to provide reasonable reunification services, the [parent] has the obligation to demand other, different or additional services prior to the termination hearing."); *see also In re L.M.*, 904 N.W.2d 835, 840 (Iowa 2017) (concluding parent waived her right to challenge reasonable efforts when she first raised the issue on appeal).

But here, the county attorney filed notice that K.A. was a potential biological father in March and, by early May, the juvenile court ordered DHS to paternity test the father. In the meantime, the father indicated his willingness to comply with testing and stayed in contact with DHS, awaiting his chance to be tested. "[E]veryone was aware of the needed service early in the case, the need was raised to the court, and then the court ordered it to be addressed. At a minimum, the spirit of our error-preservation rules were met in this case." *In re A.H.*, No. 21-1189, 2022 WL 246258, at *3 (Iowa Ct. App. Jan. 27, 2022); *accord In re P.L.*, No. 19-0103, 2019 WL 1294809, at *1 (Iowa Ct. App. Mar. 20, 2019) ("Our error-preservation rules are 'not designed to be hypertechnical.'" (citation omitted)). So, we consider whether DHS complied with its mandate to make reasonable efforts.

(Iowa 2000) ("[T]he scope of the efforts by the DHS to reunify parent and child after removal impacts the burden of proving those elements of termination which require reunification efforts."). We agree. DHS failed to provide court-ordered paternity testing because it was inconvenient for the fiscal budget and yet refused to offer services meant to ensure K.A. could take over parenting the child if he was determined to be the biological father because his paternity had not yet been confirmed. It is not clear DHS made any efforts—let alone reasonable efforts—to reunify L.F. with her possible biological father, K.A. *See* Iowa Code § 232.102(10)(a)(1) (providing that we shall consider "[t]he type, duration, and intensity of services or support offered or provided to the child and the child's family" when deciding whether reasonable efforts have been made).

Because DHS failed to satisfy its reasonable-efforts requirement, the termination of K.A.'s possible parental rights cannot stand. *See, e.g.*, *In re R.C.*, No. 16-1131, 2016 WL 4803919, at *5–6 (Iowa Ct. App. Sept. 14, 2016) (reversing termination upon finding the State failed to satisfy the reasonable-efforts requirement). We reverse the termination of K.A.'s potential rights and remand; DHS must immediately authorize paternity testing for K.A. If K.A. is not the biological father of L.F., then he is without any parental rights to L.F. If K.A. is the biological father, we expect K.A. will receive services meant "to eliminate the need for removal of the child or make it possible for the child to safely return to the family's home." Iowa Code § 232.102(10)(a).

**AFFIRMED ON MOTHER'S APPEAL; REVERSED AND REMANDED ON POTENTIAL FATHER'S APPEAL.**